IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| TRANSAMERICA PREMIER LIFE INSURANCE COMPANY, | § § § § § |
| *Plaintiff*, | § |
| v. | § Civil Action No. 4:19-cv-3213 |
| | § |
| EMMANUEL AFOLABI, | § § |
| *Defendant*. | § § |

**PLAINTIFF'S COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF**

Plaintiff, Transamerica Premier Life Insurance Company ("Transamerica"), acting by and through its counsel, Cozen O'Connor, files this complaint for damages and declaratory relief against Emmanuel Afolabi ("Afolabi"), and in support thereof, states the following:

**PARTIES**

1. Transamerica is an insurance company organized and existing under the laws of the State of Iowa with its principal place of business in Cedar Rapids, Iowa, and is therefore deemed to be a citizen of the State of Iowa.

2. Afolabi is an adult individual residing at 1117 Birch Rise Road, Richmond, Texas 77406, and is a citizen of the State of Texas.

**JURISDICTION AND VENUE**

3. Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332, because the dispute is between citizens of different states and the amount in controversy exceeds the sum of $75,000.00, exclusive of interest and costs.

4. Venue is proper in the United States District Court for the Southern District of Texas pursuant to 28 U.S.C. § 1391(b)(1) because the Southern District of Texas is the judicial district in which Afolabi resides.

5. Venue is also proper in the United States District Court for the Southern District of Texas pursuant to 28 U.S.C. § 1391(b)(2) because the Southern District of Texas is the judicial district in which a substantial part of the acts and omissions giving rise to Transamerica's claims against Afolabi occurred.

## FACTS COMMON TO ALL COUNTS

6. This is an action in which Transamerica alleges fraud against Afolabi in connection with a claim for benefits initiated by Afolabi under a long-term care insurance contract with Transamerica.

7. On or about August 20, 2013, Transamerica issued a Flexible Premium Adjustable Life Insurance policy with Long Term Care Insurance Rider, No. 014576803, to Afolabi (together, the "Policy"). A true and correct copy of the Policy (minus the Application) is attached hereto as **Exhibit A**.

8. The Policy provides coverage for certain Qualified Long-Term Care Services – meaning "necessary diagnostic, preventative, therapeutic, curing, treating, mitigating and rehabilitative services, and maintenance or personal care services," subject to the terms and conditions of the Policy – in the event Afolabi is unable to perform two or more Activities of Daily Living ("ADLs") without Substantial Assistance from another person.

9. Substantial Assistance is defined in the Policy to mean either Hands-On Assistance or Standby Assistance meaning, among other requirements, that Afolabi must require the immediate physical presence of a caregiver.

10. The ADLs defined in the Policy include Bathing, Continence, Dressing, Eating, Toileting, and Transferring.

11. Thus, in the event Afolabi required Hands-On or Standby Assistance from another person to perform two or more ADLs, the Policy would pay benefits to Afolabi provided Afolabi retained, utilized and incurred expenses for the services of an approvable caregiver to assist with the performance of those ADLs, subject to the terms and conditions of the Policy.

12. Notably, benefits under the Policy were only triggered if Afolabi incurred actual expenses for care services rendered. This meant that Afolabi needed to receive care in exchange for remuneration, then submit invoices and other Proof of Loss to Transamerica in order for benefits to be paid. Transamerica was only obligated to pay benefits in the event Afolabi received care and incurred actual expenses for that care, and the care itself was of a nature that it would not have been provided to Afolabi free of charge in the absence of insurance.

13. The Policy also specifically excluded coverage for care provided by any member of Afolabi's Immediate Family.

14. On or about August 1, 2016, Afolabi initiated a claim for long-term care insurance benefits under the Policy. The date on which the claim was opened was approximately nine months after Afolabi was involved in a motorcycle accident that formed the basis of the claim.

15. Transamerica approved Afolabi's claim and began paying benefits.

16. Afolabi identified TEG Home Health Agency ("TEG") as his caregiver. On information and belief, TEG is owned and operated by a member of Afolabi's Immediate Family.

17. Afolabi represented to Transamerica that TEG provided care in his home his home 12-13 hours per day, seven days per week, throughout the entirety of his three year claim.

3

18. Afolabi's prognosis at the outset of the claim was such that Transamerica reasonably believed and expected that Afolabi would return to independence.

19. Transamerica was therefore surprised when Afolabi continued to claim for benefits late into 2017 (two years from the date of the accident) and beyond.

20. Beginning in late 2017, Transamerica initiated surveillance on Afolabi. Notwithstanding his ongoing representations to Transamerica that he received 12-13 hours of care from TEG each day, no caregiver was seen arriving at or departing his residence, or otherwise.

21. Transamerica continued to approve Afolabi's claim but remained cautious about the veracity of Afolabi's subjective reports due to the unusual persistence of the claim and apparent lack of caregivers, which called into question whether he was, in fact, receiving care and incurring actual expenses for care such that benefits under the Policy would potentially have been triggered.

22. On May 3, 2018, Transamerica sent Afolabi for an Independent Medical Examination ("IME") in accordance with its contractual rights under the Policy.

23. The IME was performed by Dr. Sunil Thomas, who is board certified in Physical Medicine and Rehabilitation and had no prior relationship with either Transamerica or Afolabi.

24. During the IME, Afolabi purported to behave in a manner consistent with having significant functional limitations including, but not limited to, reporting a continuing need for Substantial Assistance with Bathing and Toileting.

25. Afolabi presented at the IME with a woman who purported to be his caregiver – the first time anyone purporting to be Afolabi's caregiver was seen with Afolabi, despite prior periods of surveillance.

26. Based in substantial part on Afolabi's subjective representations and behaviors during the IME, Dr. Thomas initially opined that Afolabi required Substantial Assistance with

Bathing, Dressing, Toileting and Transferring. In other words, it was Dr. Thomas' initial impression that Afolabi met the benefit eligibility triggers in his Policy. Accordingly, Transamerica continued to pay benefits.

27. In September 2018, Transamerica performed another round of surveillance on Afolabi. As it had done previously, Transamerica performed this surveillance on dates and during time periods throughout the day when Afolabi specifically represented to Transamerica that he was receiving and incurring expenses for care services from TEG.

28. Afolabi was observed engaging on a daily basis in activities, tasks and movements which directly contradicted his past and ongoing representations to Transamerica that he suffered from multiple ADL deficiencies. In fact, Afolabi was seen going to work on multiple dates at his job as an auto mechanic – a physically demanding job, the mere nature of which is inconsistent with the notion that Afolabi suffered from an inability to perform multiple ADLs without Substantial Assistance.

29. Relatedly, no caregiver was seen at any time despite Afolabi continuing to represent to Transamerica that he received and incurred expenses for care from TEG 12-13 hours each day.

30. Due to the seemingly irreconcilable disconnect between Afolabi's reported functionality and the level of functionality seen on video, Transamerica provided the video to Dr. Thomas so he would have the benefit of all available information.

31. Transamerica asked Dr. Thomas whether the video changed any of the opinions he expressed in his initial IME report.

32. Dr. Thomas confirmed that the video did, in fact, change his opinion. He prepared an addendum to the initial IME report in which he concluded:

> Based on this video recording and this new evidence which was not present prior to the IME, the opinion regarding Mr. Afolabi's functionality needs to be adjusted.

5

> Based on the video surveillance, he is able to ambulate independently without the use of an assistive device with a fairly steady gait and as well as hold a cup… He is also noted to enter the driver's side of a vehicle and [is] presumably driving. Based on his abilities to perform these activities independently, it is my opinion that at this time he would not need assistance from another individual to bathe, dress, toilet, ambulate and transfer.
>
> ***
>
> He should not have difficulties performing basic ADLs in question.

33. Although the September 2018 surveillance and IME addendum suggested that Afolabi was engaging in fraud, Transamerica continued its investigation in order to develop additional information before taking any action adverse to Afolabi. Transamerica continued to pay benefits while it investigated.

34. Transamerica performed another round of surveillance in January 2019. Afolabi was once again observed on multiple dates performing tasks outside the home that were inconsistent with his representations to Transamerica and the notion that he suffered from an inability to perform ADLs without Substantial Assistance, like driving a car, reaching and bending, going to work and walking without a pronounced limp or the quad-cane he purported to need.

35. Similarly, no caregiver was observed on any date or at any time despite Afolabi representing to Transamerica that he received and incurred expenses for care 12-13 hours per day, seven days per week, on each day during the surveillance period.

36. At the suggestion of Dr. Thomas, and in accordance with Transamerica's rights under the Policy, Transamerica directed Afolabi to participate in a Functional Capacity Examination ("FCE") in February 2019.

37. Afolabi underwent that FCE with Keith Perry, DPT, who is unaffiliated with either Afolabi or Transamerica.

38. The FCE report was inconclusive due to evidence of Afolabi malingering during the Evaluation. Mr. Perry recorded that "Emmanuel Afolabi demonstrated inconsistent and self-limiting performance with testing," among other observations arising from Afolabi's failure to participate in the Evaluation in good faith.

39. Transamerica performed additional surveillance in connection with Afolabi's arrival at and departure from the February 28, 2019 FCE. Notably, Afolabi was seen in the presence of another person who purported to be his caregiver and to be providing assistance. Afolabi also walked with a quad cane and limp when he presented for the FCE, despite being seen walking without a cane or limp and having no caregiver present during multiple, earlier periods of surveillance.

40. Afolabi's use of a cane and putative caregiver during the FCE were intended to convey to Mr. Perry and Transamerica that his functional limitations were of a nature that would entitle him to continue receiving benefits under the Policy when, in fact, he was not.

41. In accordance with the requirements of the Policy, Afolabi underwent another face to face assessment with a licensed social worker on May 23, 2019 for the purpose of evaluating his ongoing eligibility for benefits under the Policy.

42. During the May 23, 2019 assessment, Afolabi represented that he needed Substantial Assistance with five ADLs – Bathing, Toileting, Eating, Dressing and Transferring.

43. He further represented that he needed and received care from TEG 13 hours per day, seven days per week. He reported an inability to walk without a quad cane, and purported to walk with a pronounced limp. He stated that he could not get out of bed without assistance. He stated that he needed assistance with transportation. And he represented that he could not and did not drive a car, particularly due to the fact that he could not turn the key or use his hands.

44. Transamerica performed surveillance the same week as the May 2019 assessment.

45. Transamerica observed Afolabi driving a car on multiple dates in direct and irreconcilable contradiction to his representations to the assessor.

46. Transamerica observed Afolabi going to work each day. And, while at work, Transamerica observed Afolabi lying on his back on the ground for a protracted period of time while working under a car, among many other observations.

47. There were, once again, no apparent limitations to Afolabi's functionality whatsoever. In fact, Afolabi's ability to lie under a car and to get up again without difficulty – let alone Substantial Assistance – directly refutes the notion that he was unable to transfer in or out of a bed, as reported to the assessor the very same week.

48. Afolabi did not use a cane at any time during the week-long period of surveillance.

49. As with prior periods of surveillance, Afolabi was never once seen in the presence of a caregiver despite surveillance being obtained on dates and during times of day when Afolabi specifically represented to Transamerica in billing statements submitted to the company in support of his claim that he received and incurred expenses for care.

50. Transamerica completed its investigation and denied Afolabi's claim under the Policy on August 26, 2019.

51. In total, Transamerica performed more than 25 days of surveillance during its investigation. Afolabi was never seen in the presence of a caregiver *except* on those dates when he underwent an IME, FCE or assessment in order to evaluate his continuing eligibility to receive benefits – *i.e.*, those dates on which the person performing the evaluation would report to Transamerica that Afolabi had a caregiver in place.

52. On information and belief, the individuals who appeared with Afolabi at these evaluations and purported to be his caregivers were not his caregivers but members of his Immediate Family pretending to be caregivers.

53. On information and belief, TEG, a home health care agency that is believed to be owned and operated by a member of Afolabi's Immediate Family, facilitated the fraud and civil theft described herein by helping Afolabi to give Transamerica the false impression that Afolabi needed, received and paid for care despite the knowledge of TEG's officers, employees, agents and affiliates that Afolabi did not need care, did not receive care and did not incur expenses for care.

54. Transamerica paid a total of $285,960.00 in benefits to Afolabi as a result of his knowing, intentional, willful, wanton and repeated misrepresentation of material facts to Transamerica.

55. Afolabi's fraudulent conduct was of such an egregious nature that it shocks the conscience and justifies an award of punitive damages in addition to compensatory damages.

56. Moreover, Transamerica is entitled to a declaration that the Policy is void under the inherent power of the Court to adjust the equities between the parties due to Afolabi's breach of the implied covenant of good faith and fair dealing between the parties and as a means of compensating Transamerica for its losses.

57. There is, therefore, an actual, present and justiciable controversy between the parties for which there is no adequate remedy at law as to whether the Policy is void.

## **COUNT I – FRAUD**

58. Transamerica incorporates the preceding paragraphs of the complaint as though set forth fully herein.

59. Afolabi misrepresented material facts knowingly, purposefully and with an intent to defraud Transamerica, including:

   a. Representing to Transamerica throughout most or all of the duration of the claim that he was eligible for benefits due to a qualifying ADL deficiency when, in fact, he suffered from no such deficiency;

   b. Representing to Transamerica throughout most or all of the duration of the claim that he received care from TEG when, in fact, he did not receive care from TEG;

   c. Representing to Transamerica throughout most or all of the duration of the claim that he received care from an eligible and approvable care provider when, in fact, he did not; and

   d. Representing to Transamerica throughout most or all of the duration of the claim that he incurred expenses for eligible care services when, in fact, he did not.

60. Afolabi made each of these misrepresentations repeatedly and with actual knowledge of its falsity.

61. Afolabi made each of these representations to Transamerica or to another person or entity with knowledge and intent that the false information would be communicated to Transamerica and acted upon by Transamerica for his benefit and to Transamerica's detriment.

62. Transamerica reasonably and justifiably relied on Afolabi's misrepresentations to Transamerica and others to its detriment when it paid benefits to Afolabi.

63. Afolabi knew Transamerica would decline to pay benefits if it knew the true nature of his claim, including his true level of functionality, the fact that he was not receiving care from

TEG or any approvable caregiver as represented, or the fact that he was not incurring expenses for the care received, if any.

64. Transamerica would, in fact, have declined to pay benefits if it knew the true nature of Afolabi's claim, including his true level of functionality, the fact that he was not receiving care from TEG or any approvable caregiver as represented, or the fact that he was not paying for the care received, if any.

65. As a direct and proximate result of Afolabi's fraudulent misrepresentations, Transamerica paid benefits to Afolabi totaling $285,960.00.

66. Transamerica incurred additional losses in an amount to be determined at trial relating to the cost of investigating Afolabi's fraudulent claim – losses that would not have been incurred but for Afolabi's initial and ongoing pattern of fraudulent conduct.

## COUNT II – CIVIL THEFT

67. Transamerica incorporates the preceding paragraphs of the complaint as though set forth fully herein.

68. Afolabi has engaged in civil theft under the Texas Theft Liability Act, Tex. Civ. Prac. & Rem. Code Ann. §§ 134.001-.005, by unlawfully appropriating Transamerica's property with intent to permanently deprive Transamerica of such property.

69. To wit, Afolabi unlawfully obtained insurance benefits from Transamerica through fraud and artifice with intent to retain all such funds.

70. The funds obtained by Afolabi were the lawful property of Transamerica and would not have been paid to Afolabi but for his fraud and artifice.

71. Afolabi, by contrast, had no legitimate right to receive or retain such funds.

### COUNT III – DECLARATION THAT THE POLICY IS VOID

72. Transamerica incorporates the preceding paragraphs of the complaint as though set forth fully herein.

73. Insurance contracts are agreements *uberrimae fidei* and are imbued with a mutual implied covenant of good faith and fair dealing.

74. By initiating and perpetuating a protracted fraud against Transamerica, Afolabi has breached the implied covenant and demonstrated that he is incapable of proceeding in good faith in an ongoing contractual relationship with Transamerica.

75. Accordingly, it is necessary and appropriate for the Court to exercise its inherent power to adjust the equities between the parties by declaring the Policy void so Transamerica is not faced with a future threat of fraudulent claims.

76. In the alternative, it is necessary and appropriate for the Court to declare the Policy void as a means of compensating Transamerica for a portion of the losses attributable to Afolabi's fraudulent conduct.

77. There is, therefore, and actual, present and justiciable controversy between the parties for which there is no adequate remedy at law as to whether the Policy is void.

### COUNT IV – RESTITUTION OF BENEFITS PAID

78. Transamerica incorporates the preceding paragraphs of the complaint as though stated fully herein.

79. Transamerica has no present obligation to pay benefits under the Policy due to one or more of: (1) Afolabi's lack of a qualifying ADL deficiency; (2) Afolabi's failure to receive care from any caregiver; (3) Afolabi's failure to receive care from a caregiver that is approvable under

the terms of the Policy; and/or (4) Afolabi's failure to incur expenses for care as represented to Transamerica such that reimbursement under the Policy could be appropriate.

80. Transamerica had no obligation to pay benefits under the Policy during some or all of the period of Afolabi's claim due to one or more of: (1) Afolabi's lack of a qualifying ADL deficiency; (2) Afolabi's failure to receive care from any caregiver; (3) Afolabi's failure to receive care from a caregiver that is approvable under the terms of the Policy; and/or (4) Afolabi's failure to incur expenses for care as represented to Transamerica such that reimbursement under the Policy could be appropriate.

81. Transamerica is entitled to restitution in the amount of the benefits paid by Transamerica since a date to be determined by the Court.

WHEREFORE, Transamerica respectfully demands the following relief:

1. Actual and compensatory damages in an amount to be determined at trial, plus interest;
2. Punitive damages;
3. Attorney's fees;
4. The costs of litigation;
5. A judicial declaration that the Policy is void;
6. A judicial declaration that Transamerica may retain some or all of the premium paid for the Policy;
7. Restitution of benefits paid to Afolabi since a date to be determined by the Court;
8. Such other relief as may be demonstrated at trial; and
9. Such other relief as the Court deems just and proper.

Respectfully submitted,

*s/ Bryan P. Vezey*
Bryan Vezey
State Bar No. 00788583
S.D. Texas I.D. No. 19217
COZEN O'CONNOR
1221 McKinney, Suite 2900
Houston, Texas 77010
Telephone: (832) 214-3900
Telecopier: (832) 214-3905
E-mail: bvezey@cozen.com

OF COUNSEL:

Michael D. Rafalko (*pro hac vice* to be filed)
Katharine E. Mooney (*pro hac vice* to be filed)
COZEN O'CONNOR
One Liberty Place
1650 Market Street, Suite 2800
Philadelphia, PA 19103
T: 215-665-4611
mrafalko@cozen.com
kmooney@cozen.com

COUNSEL FOR PLAINTIFF,
TRANSAMERICA PREMIER LIFE INSURANCE
COMPANY